In re TANG TUN et ux. In re GANG GONG. In re CAN PON.

(District Court, W. D. Washington, N. D. May 18, 1908.)

Nos. 3326, 3606, 3647.

1. ALIENS—DEPORTATION OF CHINESE—REVIEW OF DECISION BY COURTS.

Evidence considered on an application for a writ of habeas corpus by a person of Chinese descent claiming to be a citizen of the United States by birth, but who, with his wife, was denied admission on his return from China, and *held* to establish his citizenship and right to enter with his wife, and also to clearly sustain his contention that he was not given a fair and impartial hearing by the immigration inspector, nor any hearing on the merits on his appeal to the Secretary of Commerce and Labor, which facts entitled him to apply to the courts for the protection of his constitutional rights as a citizen.

2. SAME—HEARING ON CLAIM OF CITIZENSHIP—DUE PROCESS OF LAW.

A hearing by an immigration inspector of the case of a person of Chinese descent claiming to be a native-born citizen of, and seeking to enter, the United States, upon testimony and unsworn statements taken ex parte, without giving the applicant or his counsel the opportunity to be present, is not a judicial inquiry nor due process of law.

[Citizenship of the Chinese, see notes to Gee Fook Sing v. United States, 1 C. C. A. 212; Lee Sing Far v. United States, 35 C. C. A. 332.]

3. SAME—POWERS OF SECRETARY OF COMMERCE AND LABOR.

Laws which confer judicial discretion upon administrative officers must be construed with a degree of strictness requisite to make them consonant with the spirit of the fundamental doctrines of the Constitution, and the power conferred on the Secretary of Commerce and Labor by the Chinese exclusion act to finally determine on appeal the right to enter the United States by a person who claims to be a native-born citizen cannot be exercised by an acting secretary in accordance with a recommendation made by himself as a solicitor of the Department adverse to the appellant.

Habeas Corpus. For relief of alleged citizens of Chinese parentage, whose right to enter the United States was denied by officers of the Immigration Bureau.

McCafferty & Godfrey and Kerr & McCord, for Tang Tun et ux.

Fred H. Lysons and Will H. Thompson, for Gang Gong.

Hammond & Hammond, for Can Pon.

Elmer E. Todd, U. S. Dist. Atty., Charles T. Hutson, Asst. U. S. Atty., and Frederick G. Dorety, Asst. U. S. Atty.

HANFORD, District Judge. In the first of these cases, a man and his wife are contending for the right to come into the United States to reside permanently, and that right has been denied by officers of the government, on the ground that they are Chinese persons who are, by the laws of this country, prohibited from entering. The husband, although of Chinese parentage, has discarded the queue and garb which distinguish the Chinese in outward appearance from the people of other nationalities, and he claims this as his native country and the rights of a citizen. The evidence proves conclusively that Tang Tun lived at Seattle continuously for a period of about eight years previous to September, 1905, during which period he was an employé of the Wa Chong Company, a well-known Chinese firm engaged in mercantile business and operating a market garden near Seattle, and he became acquainted with well-known citizens, who have given testimony in his behalf, and who were acquainted with the man he claims as his father.

The evidence also proves conclusively that Tang Tun came to Puget Sound from China on the steamship Tacoma in the year 1897, having then in his possession certain affidavits made by citizens of Seattle, which he exhibited to the collector of customs as evidence to establish his identity and nativity. The law in force at that time vested in the collector of customs authority to decide as to the right of Chinese persons coming to the United States by sea to land and remain in this country, and the collector made an indorsement upon said identification affidavits, indicating the date of arrival, the name of the

vessel, and his decision permitting the contestant to land, and signed it and delivered the affidavits so indorsed to the contestant. but retained duplicates, upon which he made an indorsement indicating a contrary decision, and he also made a record that the contestant's right to enter the United States had been denied Notwithstanding the record in the Custom House, the contestant did live in Seattle, and was employed by the Wa Chong Company, as above stated, until September, 1905, when he was given a $1,000 interest in his employer's business, and he then went to China and was there married. The marriage was solemnized by Rev. C. A. Nelson, a Christian missionary at the American Consulate in Canton, China, May 21, 1906, and is evidenced by a marriage certificate signed by P. S. Heintzleman, Vice and Deputy Consul General of the United States of America, and authenticated by the seal of the Consulate.

The case appears to me to have been overworked; that is to say, the attorneys have weakened the case for their clients by unnecessarily calling as witnesses Mr. Fitzhenry and Mr. Burritt, whose testimony as to the most important facts is unbelieveable. These witnesses having been, in times past, acquainted with many of the Chinese inhabitants of Seattle, are called frequently to testify with respect to the identity of different Chinese persons claiming to have been born in Seattle. Attorneys looking for this kind of evidence find them convenient, and it appears to be easy to convince them of their ability to verify, from memory, facts suggested by others with respect to Chinese families; but their stock of Chinese reminiscences appears to have become exhausted. In this case both of them made bad guesses when interrogated with respect to a photograph of Tang Tun. I reject their testimony entirely, but I deem it to be the duty of the court to give fair consideration to the other evidence, notwithstanding this objectionable feature of the case. After making due allowance for obvious mistakes and errors in the testimony of Tang Tun and his other witnesses, I am convinced by their positive statements that there was a Chinaman named Quong Lee, who was a merchant, and that he lived with his wife in Seattle from 1878 until 1884. There is no contradiction in the record of the positive testimony of Tang Tun that he is Quong Lee's son, that he was born in the year 1879, that he lived with his father in China from about 1884 until his father died, that he came to the United States in 1897, and that before coming, the identification affidavits, above referred to, were procured by the manager of the Wa Chong Company in Seattle. He is a competent witness to prove these facts, and I find no ground for discrediting his testimony, except such minor mistakes and errors as may be found in the testimony of the average run of witnesses.

Mr. William B. Thompson, a member of the police force of Seattle, whose veracity appears to be unquestioned, was examined as a witness, and testified that, during the period from 1878 to 1884, he was engaged in the trucking and draying business in Seattle, and did work in that line for a Chinese firm of which Quong Lee was manager, and that he frequently saw children, a boy and a girl, at the place of business of said firm, who appeared to be Quong Lee's children, and that the boy appeared to be about three years of age when he

first noticed the child, and about six years of age when the family returned to China, which, according to the report of his testimony, was in 1878 or 1879. This last statement is clearly an inadvertence, shown to be such by the testimony in its entirety, and by Mr. Thompson's own statements. The other evidence fixes the time of departure in the year 1884, and, if the boy was five or six years old then, he must have been born during the time of Quong Lee's residence in Seattle. Mr. Thompson saw him after his admission to this country in 1897, and became so well satisfied as to his identity that he felt justified in making a positive statement in his testimony that this is the same boy whom he knew in childhood as the son of Quong Lee.

I consider that there is more than a mere preponderance of the evidence in favor of the contestants, and that the right of Tang Tun to invoke the jurisdiction of this court to protect him in his rights as a citizen of the United States, notwithstanding the provisions of the Chinese exclusion law denying such right to alien Chinese, has been well established. This court must and does respect the decision of the Supreme Court in the case of Ju Toy, 198 U. S. 253, 25 Sup. Ct. 644, 49 L. Ed. 1040, and must disclaim jurisdiction, unless the contestants have proved that the Chinese inspectors and the Secretary of Commerce and Labor have unjustly denied their right to enter the United States without giving them a fair and impartial hearing. The contestants have charged the representatives of the government with unfair treatment in the investigation made of their case, and with having rendered an adverse decision, contrary to the facts and the law applicable, and, by making such charge, have assumed the burden of proving it. The court finds that the truth of this accusation has been clearly and completely established by the evidence. The reasons which the inspector gave for excluding these contestants from this country are as follows:

"First, that applicant's status had already been adjudicated by officers duly charged with the enforcement of the Chinese exclusion laws; second, though given an opportunity to show that injustice may have been done by the former finding in his case, applicant failed to furnish any evidence to support such a conclusion; and third, the applicant did not furnish sufficient evidence of any status by which he was entitled to admission to the United States. The third reason for rejection was for the purpose of covering the apparent intention of the applicant to set up for himself the claim that he was a domiciled merchant."

The first of the assigned reasons has reference to the determination of the question of Tang Tun's nativity by the collector of customs in 1897, which the inspector assumed to have been adverse; in this, the prejudice of the inspector and the unfairness of his decision is clearly indicated, because the conclusion reached is contrary to the indisputable fact that Tang Tun was not excluded, but was admitted to this country and lived here, not in concealment, but openly, for eight years, his presence being known to many people, including one of the Chinese inspectors, Mr. Thos. M. Fisher, Jr., who so certifies in a report which he made on this case, which report is in the record. The record which the collector made in the Custom House by indorsements on papers filed there furnishes the only supposable

basis for the inspector's conclusion. That record, however, is not by any statute declared to be legal evidence, and it would not be competent in any court of the United States to prove any fact. It is authenticated only by the handwriting and signature of the man who was at the time collector of customs, and it is contradicted by a certificate in the handwriting of and signed by the same collector upon the original document which he delivered to Tang Tun, as evidence of his right to be in this country. In an endeavor to impeach the collector's indorsement, showing that Tang Tun had been admitted to enter the United States, the inspector in his report certifies that several other Chinese persons, having similar documents indorsed in a similar manner by the same collector, had been arrested on the premises of the Wa Chong Company, and had been, notwithstanding their possession of the collector's certificates, deported from the United States, pursuant to an order made by a United States commissioner, after a judicial investigation. If that evidence is relevant to the issue in this case, it is at least a two-edged sword. It tends to prove only that the collector of customs had been guilty in those instances of conniving at evasions of the Chinese exclusion law by furnishing fraudulent certificates. On the other hand, the arrest and deportation of the other Chinese persons holding such certificates proves the vigilance of the officers charged with enforcement of the Chinese exclusion law, other than the collector, and that they had knowledge of his fraudulent practices, and justifies an inference that Tang Tun would have been arrested and deported by them when the others were, if he had not been deemed to be lawfully entitled to remain in this country.

The second of the assigned grounds contains a glaring manifestation of prejudice on the part of the inspector. In this he certifies that, although he considered the decision of the collector of customs as being adverse to the right of Tang Tun to enter the United States, and a final adjudication of the whole matter, he nevertheless afforded a fair opportunity to prove that decision to have been unjust, and that the "applicant failed to furnish any evidence to support such a conclusion." In a sentence he eliminates not only the testimony of Fitzhenry, Burritt, and Coombs, who are regarded by the officers of the Immigration Bureau as professional witnesses in Chinese cases, but the testimony also of a man who for many years has been trusted as a member of the police force of Seattle, whose testimony has not been contradicted and has been corroborated by Mr. Fisher, as to the important fact, that Tang Tun was employed by the Wa Chong Company in Seattle for a considerable time after the date of the supposed adverse decision by the collector of customs.

It is unnecessary to comment on the third of the assigned grounds, because the contestants are not asserting a right to enter the United States as privileged aliens.

If there is error in the opinion of this court with respect to the prejudice and unfairness of the inspector, still the contestants have sustained the charge made against the government, because under the law they were entitled to have the case reviewed by the Secretary of Commerce and Labor, and, when appealed to, his decision constitutes

the final determination of the rights of an alien Chinese person to come into this country. An appeal was taken in this case, and the only response to it, appearing by the record, was the following telegraphic message: "Appeal Tang Tun and Leung Kum Wui dismissed. Murray." There being positive testimony uncontradicted, which, if carefully analyzed and fairly considered, would have justified a reversal of the inspector's decision, I am bound to understand the telegram as being literally true, indicating that the case did not receive any consideration whatever by the Secretary of Commerce and Labor, but some officer of the Department, acting for or in place of the Secretary, refused to entertain the appeal and arbitrarily, without deigning to assign a reason, dismissed it, and I must conclude that a man who by competent evidence had established a right to enjoy liberty to come and go freely in his own country, and to the protection which the Constitution of the United States guarantees, has been denied such a hearing by officers of the government as the laws enacted by Congress provide for, and by reason of such denial this court is obligated to exercise its power for his protection. Chin Yow v. United States, 208 U. S. 8, 28 Sup. Ct. 201, 52 L. Ed. ——. His wife has the same legal status that he has, and a legal right to live with her husband in this country. U. S. v. Mrs. Gue Lim (D. C.) 83 Fed. 136; Id., 176 U. S. 459, 20 Sup. Ct. 415, 44 L. Ed. 544.

## Gang Gong Case.

I have studied laboriously all of the testimony in Gang Gong's case, and the improbability of some of the statements reported to have been made by the contestant when under examination by the Chinese inspector gave rise to a suspicion in my mind that he may have been jobbed by the interpreter, and being unable to render a decision satisfactory to myself, based upon the record submitted to me, without further inquiry, I caused the man to be brought into court, and through a different interpreter, in the presence of his attorneys, I carefully interrogated Gang Gong, in a manner to afford him the fairest possible opportunity to state facts, which, if they existed, should have been known to him, and which would have led me to a conclusion favorable to him; but, although his statements on this examination varied in some particulars from his testimony taken before the inspector, he repeated some of the things which I deem improbable, and he also persisted in contradicting his alleged father in regard to facts of vital importance. I must say that the examination did not dispel the doubts which previously existed, and that there is not sufficient convincing power in all of the evidence to justify a finding that this contestant was born in Seattle, as he claims.

## Can Pon Case.

The investigations of the Chinese inspectors, which resulted in their denial of the right of this contestant to enter the United States, were conducted in a manner resembling the work of detectives, more than a judicial inquiry. Mr. Fisher, who made the first report on the case, recommended to the inspector in charge that Can Pon should be admitted. In the record of the subsequent examination of wit-

nesses by Mr. Monroe, whose report to the inspector in charge appears to have been adopted, at different places, without the contestant or his attorneys being present, there is manifested a zeal to elicit adverse testimony inconsistent with that degree of fairmindedness required of a trier in passing upon a question so important as that involved in the assertion of a man's right to return to his native land. It appears that Mr. Monroe received and gave credence to statements made by a Chinese laundryman, named Chin Leong, who refused to make his statement under oath. I find also that in his examination of Look Wing, the father of Can Pon, Mr. Monroe in several instances evinced a hostile disposition by jeering the witness for being unable to give satisfactory responses to vexatious compound interrogatories. In his report to the inspector in charge, besides commenting on discrepancies and contradiction in the testimony and quoting the statement of Chin Leong to the effect that he knew Look Wing personally, and that the latter never had a wife and children in Seattle, Mr. Monroe makes the following statement:

"The census of Seattle Chinese, made in 1895, gives the name of this Look Wing, but not the name of his wife or alleged boys. We have reason to believe this census to be very reliable as great care was taken in its compilation."

The record, however, contains no other information by which the accuracy of the census referred to may be judged.

The case having been decided adversely to the right of Can Pon to come in, an appeal was taken to the Secretary of Commerce and Labor, and in sending up the record the testimony of one of the witnesses which was, in the main, favorable to the contestant, was inadvertently omitted, and therefore did not receive consideration in the Department. The record contains a recommendation by the Commissioner General of Immigration and Naturalization that the appeal be dismissed, also a report by Chas. Earl, solicitor of the Department of Commerce and Labor, which, so far as it is material, reads as follows:

"The appellant, who is now about 15 years old, claims to be the son of Look Wing, and to have been born in Seattle, and to have lived there until he was about 7 years old, when he went to China with his parents. His right to admission depends upon the establishment of the fact of birth as claimed. The testimony taken is so voluminous, and the statements of the various witnesses are so confusing, that an analysis of the testimony is impracticable. Whether or not there might be deduced from the mass of testimony a story which is reasonable and which is consistent with the assumption that the appellant was born in the United States, it is certainly true that he has failed to establish his claim with that degree of certainty which should be required. In order to assume that the appellant was born in the United States, as claimed by the alleged father, it would be necessary to assume that the alleged father made a misstatement when he said in his examination of June 6, 1907 (see record in case of Look Wing) that neither his wife nor his children had ever been in the United States, or that the record of that examination was wrong, and, in short, to assume that the record of his testimony is full of inaccuracies, or that his condition of mind since his sickness in 1905 (see affidavit and testimony of Dr. Maxson, pp. 69, 85, 86) has been such that he did not comprehend the statements he made as to where he worked at different times and the location and name of the laundry which he claims to have owned, and in which he claims that the appellant was born. And if the alleged father's

testimony is thrown out on account of its unreliability, we are no better off, for we must then rely upon the testimony of those who were not in position to know the essential facts, and this testimony is so contradictory and so uncertain as to be of little value in arriving at a satisfactory conclusion. It is recommended that the appeal be dismissed."

And it appears by the record that the appeal was dismissed by Chas. Earl, acting secretary. The statutes cannot be so constructed or applied as to deprive citizens of their birthright, and the power of the judicial branch of the government to relieve against oppression amounting to deprivation of liberty cannot be restricted to any extent greater than is necessary for the exercise of the functions which naturally and properly pertain to the executive branch. Laws which confer judicial discretion upon administrative officers must be construed with a degree of strictness requisite to make them consonant with the spirit of the fundamental doctrines of the Constitution. Having this principle in mind, I hold that, as applied to a case involving a question as to the right of an individual, claiming to be a citizen, to enter the United States, the law which gives the right of appeal to the head of an executive department, from an adverse decision by a subordinate official, places a grave responsibility upon an officer of exalted station, requiring him to give personal consideration to the appeal and to render an impartial decision, which is incompatible with a right to delegate his discretionary power. I do not mean to intimate that the appeal may not be lawfully disposed of by an acting secretary, who for the time being is the incumbent of the office; but I hold that it is contrary to the intent of the law for an acting secretary to dispose of an appeal by dismissing it, on the recommendation of himself acting in the capacity of a solicitor adversely to the appellant.

It is true that the testimony which the solicitor had to consider is, by reason of discrepancies and contradictions therein, confusing and difficult to analyze, and, considering the manner in which it was gathered, it would be unreasonable to expect clear, concise, positive, consistent, and uncontradicted statements. To what extent apparent discrepancies and contradictions might have been harmonized or eliminated, if the contestant had not been deprived of the services of his attorneys in the examination of the different witnesses, it is impossible to conjecture. Experience in judicial investigations teaches the lesson that witnesses are not infallible, and that discrepancies and contradictions in the testimony of a number of witnesses are to be expected. When all the witnesses have been well coached and drilled, and the same story is repeated by them without variation, a natural and justifiable inference arises that all of their testimony is the product of a single mind. Such inferences are usually quite as difficult to dispose of as the doubts created by discrepancies and contradictions. In all cases in which rights depend upon facts to be ascertained, the trier is bound to be patient and painstaking, even when it is troublesome to do so, in sifting the evidence in order to separate kernels of truth from masses of straw and chaff.

Officers charged with the duty of enforcing the Chinese exclusion law are to be commended for being alert to detect attempts to evade its provisions by imposters claiming to be American born, and due

allowance must be made for the inherent difficulty of uniting unswerving fidelity in detective work with judicial impartiality. From all that appears by the record, I am convinced that in this case the zeal of the inspectors who made the original decision adverse to the contestant created a bias sufficient to prevent fair treatment, including an opportunity to interrogate the witnesses against him, or to rebut their statements and fair consideration of the evidence in his favor; and that his appeal to the Secretary of Commerce and Labor was dismissed without a consideration of the case, upon its merits, so that the contestant did not have the semblance of a judicial inquiry or a fair consideration of his case. In order to decide the questions as to the legality and finality of the decision rendered by the inspector in charge adverse to the contestant and of the dismissal of the appeal by the acting secretary, I have necessarily considered the entire mass of testimony, contained in the record, as made up for presentation of the case to the Secretary on the appeal, as well as the testimony reported by the referee appointed by the court in the present proceeding; but the question of prime importance in the case is whether the contestant is or is not a native-born citizen of the United States, and the decision of that question must be founded upon legal and competent evidence. The contestant is not bound by the ex parte affidavits, statements, letters, and miscellaneous information collected by the industry of the inspectors. Therefore, for the purpose of this branch of the case, the court excludes all of the record on appeal, except the statements contained therein made by the contestant himself and his witnesses who were examined before the referee. In so far as those statements conflict with the testimony of the same witnesses given before the referee, they will have to be considered as impeaching evidence. In the evidence reported by the referee there is positive testimony to the effect that Look Wing did for a number of years operate a laundry on Western avenue in the city of Seattle at or near the corner of Bell street; that there was living with him in said laundry his wife; that there was born to them in that laundry two boys, of whom Can Pon is the younger; that the family left Seattle and went to China in the year 1899; and that Look Wing returned to Seattle, remained for a time, then made a second trip to China, and returned a few months prior to the appearance of Can Pon at Sumas, where his entrance into the United States was intercepted by the Chinese inspectors. This testimony is so well corroborated by Mr. Raymond, as well as by Chinese witnesses, that, notwithstanding all errors and mistakes, I am convinced that Can Pon was born in the city of Seattle, as he claims. He is therefore, by force of the fourteenth amendment to the Constitution of the United States, a citizen, and entitled to enjoy liberty in his own country. United States v. Wong Kim Ark, 169 U. S. 649, 18 Sup. Ct. 456, 42 L. Ed. 890.

I direct that decrees be entered in the cases of Tang Tun and his wife and Can Pon, discharging each of them from custody; and, in the case of Gang Gong, remanding him to be deported.